**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**STEVEN C. HAYES, ADC # 657050**                                                  **PLAINTIFF**

**v.**                                              **Master Case: 4:21-cv-00347-LPR**
                                                    **Member Case: 4:21-cv-00347-LPR**

**SOLOMON GRAVES, in his official**
**capacity as Secretary of the Department**
**of Corrections; and DEXTER PAYNE, in**
**his official capacity as Director of the**
**Arkansas Division of Correction**                                                **DEFENDANTS**

**ANTHONY LAMAR, ADC # 120479**                                                   **PLAINTIFF**

**v.**                                              **Master Case: 4:21-cv-00347-LPR**
                                                    **Member Case: 4:21-cv-00529-LPR**

**ASA HUTCHINSON, *et al.***                                                       **DEFENDANTS**

**WINSTON HOLLOWAY, ADC # 67507**                                                 **PLAINTIFF**

**v.**                                              **Master Case: 4:21-cv-00347-LPR**
                                                    **Member Case: 4:21-cv-00495-LPR**

**ARKANSAS GENERAL ASSEMBLY, *et***                                               **DEFENDANTS**
**al.**

<u>**ORDER**</u>

        This case is about the rights of prisoners to receive and keep COVID-19 stimulus payments

sent to them by the federal government.  Plaintiffs are inmates in the Arkansas state prison system

who have had their federal stimulus payments confiscated (or will have their stimulus payments

confiscated in the near future) by state prison officials.[1]  The confiscations are being made pursuant

---

[1] The Court wishes to express its gratitude to Mr. John Tull and his colleagues at Quattlebaum, Grooms & Tull PLLC. They graciously accepted the Court's appointment as Plaintiffs' counsel and have conducted themselves in accord with the highest ideals of our profession during this litigation.

to a law passed by the Arkansas General Assembly and signed by the Governor.[2]  On September 3, 2021, the Court granted preliminary injunctive relief that significantly limited the circumstances in which state prison officials could take and redirect the stimulus funds sent to prisoners.[3]

Pending before the Court is Plaintiffs' Motion for Summary Judgment.[4]  Plaintiffs seek a permanent injunction that: (1) prohibits the confiscation of stimulus payments that have not yet arrived; and (2) requires equitable restitution of previously confiscated stimulus payments and interest on such funds.[5]  Defendants contest certain portions of Plaintiffs' Motion but basically concede the propriety of an injunction that makes permanent the relief that the Court preliminarily granted on September 3, 2021.[6]

For the reasons below, the Court GRANTS in part and DENIES in part Plaintiffs' Motion for Summary Judgment.  As part of today's Order, the Court issues a permanent injunction.  In summary, that permanent injunction allows Defendants to continue using any federal relief or stimulus funds received by a prisoner to pay off that prisoner's existing court fines, fees, costs, or restitution.  Any federal relief or stimulus funds remaining after such obligations are satisfied must be returned to the prisoner.

---

[2] Ark. Code Ann. § 12-29-120.

[3] Prelim. Inj. Order (Doc. 79).

[4] Pls.' Mot. for Summ. J. (Doc. 330).  There are many cases that have been brought in this Court by prisoners regarding Act 1110. The legal claims in the cases substantially overlap.  The Court takes judicial notice of the filings in all of the consolidated cases. *See* Fed. R. Evid. 201.  The Court may, in the instant Order, refer to filings in some of the other consolidated cases.

[5] Pls.' Mot. for Summ. J. (Doc. 330); Plaintiff Steven Hayes's Third Am. Compl. (Doc. 158) at 16; Plaintiff Anthony Lamar's Am. Compl., *Lamar v. Hutchinson*, 4:21-cv-00529-LPR, (Doc. 11) at 14 [hereinafter *Lamar Case Docket*]; Plaintiff Winston Holloway's Compl., *Holloway v. Ark. Gen. Assembly*, 4:21-cv-00495-LPR (Doc. 2) at 9.

[6] Defs.' Resp. to Pls.' Mot. for Summ. J. (Doc. 344) at 2 (Defendants renewing their previous request that the Court make its preliminary injunction permanent); *see also* Defs.' Mot. for Permanent Inj. (Doc. 151) ¶¶ 10–13 (asking that the Court make its preliminary injunction permanent); Br. in Supp. of Defs.' Mot. for Permanent Inj. (Doc. 152) at 1.

# I. BACKGROUND[7]

The federal government enacted three major laws in response to the COVID-19 pandemic. Each of these stimulus laws authorized direct payments to almost every American adult with an income below $75,000.  The first stimulus statute, the Coronavirus Aid, Relief, and Economic Security Act ("the CARES Act"), was passed on March 27, 2020.[8]  The CARES Act provided for a $1,200 stimulus payment.[9]  The second stimulus statute, the Consolidated Appropriations Act ("the CAA"), was passed on December 27, 2020.[10]  The CAA contained a $600 stimulus payment.[11]  The third stimulus statute, the American Rescue Plan Act ("the ARPA"), was passed on March 11, 2021.[12]  The ARPA paid out $1,400.[13]

Congress made only very narrow exceptions as to who qualified to receive the stimulus payments.  Arkansas state prisoners qualified to receive the stimulus payments.  However, the State of Arkansas did not consider that a wise use of federal taxpayer funds.  On May 3, 2021, seven-and-a-half weeks after the ARPA was passed, Arkansas enacted a law ("Act 1110") that directs state prison officials to confiscate any "federal relief or stimulus funds" received by state prisoners "on or after October 13, 2020 . . . ."[14]  If the state prison officials are aware that a prisoner owes court fines, fees, costs, or restitution, the confiscated stimulus funds must first be used to pay

---

[7] This background section contains only undisputed facts.  As noted in Part II of this Order, there are no factual disputes between the parties.

[8] Pub. L. 116-136, 134 Stat. 281 (2020).

[9] 26 U.S.C. § 6428(a).

[10] Pub. L. 116-260, 134 Stat. 1182 (2020).

[11] 26 U.S.C. § 6428A(a).

[12] Pub. L. 117-2, 135 Stat. 4 (2021).

[13] 26 U.S.C. § 6428B(b).

[14] Ark. Code. Ann. § 12-29-120(a), (e).

those obligations.[15]  But if the state prison officials are not aware of any such debts, or if the prisoner does not owe any such debts, then the confiscated stimulus funds are "distributed in equal parts to . . . [a]n inmate welfare fund . . . and [t]he Division of Correction Inmate Care and Custody Fund Account."[16]  An "inmate welfare fund" is "a special fund to be administered and used . . . for the general benefit of the inmates . . . ."[17]  The Division of Correction Inmate Care and Custody Fund Account is essentially the Arkansas state prison system's general operating account.[18]

On May 10, 2021, one week after passage of Act 1110, Defendants began enforcing the law.[19]  Any stimulus check that arrived after that date was "sequestered into a fiduciary banking account . . . ."[20]  Numerous prisoners challenged Act 1110 on various constitutional and statutory grounds.  The Court consolidated those cases and designated the challenges brought by Plaintiffs Steven Hayes, Anthony Lamar, and Winston Holloway as "appropriate and representative test cases" for the purpose of efficiently moving through the preliminary-injunction and motion-to-

---

[15] *Id.* § 12-29-120(a)–(b).

[16] *Id.* § 12-29-120(c)–(d).  Act 1110 does not expressly say what happens to stimulus funds left over after paying court fines, fees, costs, or restitution. The statute says what must happen if an inmate has such existing debts: The stimulus funds must first be used to pay those debts before the inmate may use the stimulus funds "for any other purpose." *Id.* § 12-29-120(a). The statute also says what should happen in the case where an inmate has no known debts: Defendants must divert the stimulus funds to an inmate welfare fund and the Division of Correction Inmate Care and Custody Fund Account.  *Id.* § 12-29-120(d).  However, there is a third scenario that the statute does not explicitly discuss: When there are known debts, those debts are paid off, and some portion of the federal stimulus funds remain. Defendants have taken the position that, under the statute, any leftover stimulus funds also go to an inmate welfare fund and the Inmate Care and Custody Fund Account.  *See* Def.'s Consolidated Br. in Opp'n to Mot. for Temporary Restraining Order and Prelim. Inj. and in Supp. of Mot. to Dismiss (Doc. 16) at 5.  Defendants' interpretation of the statute seems pretty reasonable.  In any event, because Plaintiffs' claims are largely based on Defendants' actions under Act 1110 rather than Act 1110 itself, this discrepancy is insignificant.

[17] Ark. Code Ann. § 12-29-107.

[18] Ark. Code Ann. § 19-5-302(1)(A) ("The Division of Correction Inmate Care and Custody Fund Account shall be used for the maintenance, operation, and improvement of the Division of Correction in carrying out those powers, functions, and duties relating to nonfarm or crop-producing programs as established by law.").

[19] *See* Ex. 1 (First Decl. of Jeffrey Jerry) to Def.'s Consolidated Br. in Opp'n to Mot. for Temporary Restraining Order and Prelim. Inj. and in Supp. of Mot. to Dismiss (Doc. 16-1) ¶¶ 8–9.  Jeffrey Jerry, the Assistant Chief Financial Officer of the Arkansas Division of Correction has declared under penalty of perjury that any stimulus funds received by inmates before May 10, 2021, "were placed into the inmate's checking account . . . and the [Defendants] did not confiscate any of the funds."  *Id.* ¶¶ 2, 8.

[20] *See id.* ¶ 7; Ex. 1 (Second Decl. of Jefferey Jerry) to Br. in Supp. of Pls.' Mot. for Summ. J. (Doc. 331-1) ¶ 10.

dismiss phases.[21]  Subsequently, the Court determined that these cases were appropriate test cases to advance to the summary judgment stage.[22]

Plaintiff Steven Hayes's $1,400 stimulus payment under the ARPA was confiscated by state prison officials.[23]  Plaintiff Anthony Lamar's $1,400 stimulus payment under ARPA was likewise confiscated.[24]  Mr. Lamar is also awaiting his $1,200 stimulus payment under the CARES Act and his $600 stimulus payment under the CAA.[25]  Plaintiff Winston Holloway's $1,400 stimulus payment under the ARPA was confiscated by prison officials.[26]

---

[21] *See* Consolidation Order (Doc. 36) at 6.  At the time of this consolidation, Plaintiff Anthony Lamar was proceeding *pro se* and had filed a motion for a preliminary injunction.  Plaintiff Winston Holloway was proceeding *pro se*, and Defendants had filed a motion to dismiss Mr. Holloway's complaint.  Plaintiff Steven Hayes had already been appointed counsel (Mr. Tull) by the Court, and Defendants had filed a motion to dismiss Mr. Hayes's operative complaint.  Shortly after consolidation, the Court held a joint hearing on Mr. Lamar's motion for a preliminary injunction and Defendants' motions to dismiss Mr. Holloway's and Mr. Hayes's complaints.  Subsequently, the Court appointed Mr. Tull as counsel for Mr. Lamar and Mr. Holloway.  *See* Order (Doc. 253).

While the Preliminary Injunction Order (Doc. 79) technically only relates to Mr. Lamar's *pro se* motion, the Court will nonetheless refer to the preliminary injunction as being advanced on behalf of all three Plaintiffs—for the ease of reading and to correspond to the practical reality of this case.

[22] *See* Order (Doc. 254) (consolidating *Hayes*, *Lamar*, and *Holloway* "for all purposes").

[23] Br. in Supp. of Pls.' Mot. for Summ. J. (Doc. 331) at 4.  Mr. Jerry stated that Mr. Hayes had received and spent other stimulus funds (presumably those under either the CARES Act and/or the CAA) before the state prison officials began enforcing Act 1110.  *See* Ex. 1 (First Decl. of Jeffrey Jerry) to Def.'s Consolidated Br. in Opp'n to Mot. for Temporary Restraining Order and Prelim. Inj. and in Supp. of Mot. to Dismiss (Doc. 16-1) ¶ 8; *see also*  Ex. 1 (Second Decl. of Jefferey Jerry) to Br. in Supp. of Pls.' Mot. for Summ. J. (Doc. 331-1) at 5.

[24] Br. in Supp. of Pls.' Mot. for Summ. J. (Doc. 331) at 4.  Mr. Lamar's ARPA stimulus payment was deposited into his inmate banking account on April 5, 2021.  *Id.*  "Within seconds, the Defendants seized $1,395" of that stimulus payment and used those confiscated funds to pay "certain fines, fees, costs, and restitution that Mr. Lamar owed."  *Id.*  It is unclear to the Court how Defendants' enforcement of Act 1110 could have been responsible for this April 5, 2021 confiscation because Act 1110 did not become effective until May 3, 2021.  *See* Ark. Code. Ann. § 12-29-120.  It is true that Act 1110 reaches back to any payments received "on or after October 3, 2020," *id.*, but that does not mean a law that is not yet in effect can be enforced.

Perhaps the correct explanation for the April 2021 confiscation is Arkansas Department of Corrections Administrative Directive ("AD") 16-44.  AD 16-44 allegedly allows Defendants to deduct money from an inmate's account to pay a prisoner's obligations so long as at least $5 remains in the inmate's account.  *See Lamar Case Docket*, (Doc. 11) ¶¶ 28–29.  In his *pro se* Amended Complaint, Mr. Lamar also sought to challenge the constitutionality of AD 16-44.  *Id.*  If AD 16-44 is indeed responsible for the April 2021 confiscation, then this Order and the injunction entered today do not cover that confiscation.  Today's ruling is only relevant to the enforcement of Act 1110.  Mr. Lamar, or any other state prisoner, can challenge the constitutionality of AD 16-44 at another time.

[25] Br. in Supp. of Pls.' Mot. for Summ. J. (Doc. 331) at 4.

[26] *Id.*  Mr. Holloway "owed some court costs to the federal courts," *id.*, but it is not clear at this time whether any of Mr. Holloway's confiscated stimulus funds have been used to pay off those fines.  In a Declaration filed on September 2, 2021, Mr. Jerry stated that all $1,400 of Mr. Holloway's confiscated federal stimulus funds were being held in the

On September 3, 2021, the Court entered a preliminary injunction after finding that Plaintiffs were likely to succeed in proving that diverting prisoners' stimulus funds to an inmate welfare fund and the Division of Correction Inmate Care and Custody Fund Account violates the Takings Clause of the Fifth Amendment and the procedural component of the Due Process Clause of the Fourteenth Amendment.[27]   Under that preliminary injunction, Defendants have been able to: (1) continue confiscating prisoners' stimulus payments; and (2) continue using the confiscated funds to pay off existing court fines, fees, costs, or restitution.[28]   But any stimulus funds leftover after paying court fines, fees, costs, or restitution have been held in the sequestered account maintained by the state prison officials.[29]

Shortly after the Court entered the preliminary injunction, Defendants made a rather unique request—they asked the Court to make its preliminary injunction permanent.[30]   In that scenario, any excess stimulus funds currently sitting in the sequestered account would be returned to the prisoners.   From this request, it appears that Defendants are basically acquiescing to the legal conclusions in the Court's Preliminary Injunction Order.   Although the Court appreciated (and still appreciates) Defendants' attempt to streamline this litigation, the Court explained to Defendants that we cannot jump to the finish line so easily.[31]   That is because Plaintiffs do not agree with all the legal conclusions in the Court's Preliminary Injunction Order, and they have every right to a

---

sequestered account.  *See* Ex. 1 (Second Decl. of Jefferey Jerry) to Br. in Supp. of Pls.' Mot. for Summ. J. (Doc. 331-1) at 5.

[27] *See* Prelim. Inj. Order (Doc. 79).   The Court also concluded that irreparable harm was established and that the remaining *Dataphase* factors either cut in Plaintiffs' favor or were neutral.  *Id.* at 24–28.

[28] *Id.* at 28–30.

[29] *Id.*   As of January 10, 2022, the sequestered account had a balance of $2,784,849.96.  *See* Ex. 1 (Third Decl. of Jeffrey Jerry) to Defs.' Resp. to Pls.' Mot. for Summ. J. (Doc. 344-1) ¶ 8.   Defendants had deposited a total of $4,405,227.57 into the sequestered account.  *Id.* ¶ 5.   From those deposits, $1,620,377.61 had been withdrawn to pay prisoners' court fines, fees, costs, or restitution.  *Id.* ¶ 6.

[30] *See* Defs.' Mot. for Permanent Inj. (Doc. 151); Br. in Supp. of Defs.' Mot. for Permanent Inj. (Doc. 152).

[31] Dec. 1, 2021 Hr'g Tr. at 3–6.

full airing of their legal arguments.  Plaintiffs do not only want to receive the stimulus funds leftover after their court fines, fees, costs, or restitution are paid off.  Plaintiffs want, and believe they are entitled to, the return of all of their stimulus funds.  In light of these developments, and the fact that everyone agreed there were no factual disputes in the case, the Court suggested that the Plaintiffs might want to move for summary judgment.[32]  The Plaintiffs took the Court up on this suggestion.  On December 31, 2021, they filed the pending Motion for Summary Judgment.[33]

Plaintiffs' Motion for Summary Judgment seeks "equitable restitution [of] the money that the Defendants seized and the interest the Defendants have earned on the Plaintiffs' money . . . ."[34] The crux of Plaintiffs' Motion boils down to two issues: (1) whether the state prison officials are prohibited from using prisoners' stimulus payments to pay off court fines, fees, costs, or restitution; and (2) whether the Plaintiffs are entitled to interest on whatever funds were unlawfully confiscated.  Defendants say the answer to each of these questions is no.

## II. DISCUSSION

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[35]  Here, there are no factual disputes between the parties.  The (very few) points of contention are purely questions of law.

Plaintiffs argue that enforcement of Act 1110 violates the Takings Clause, procedural due process, and substantive due process.[36]  The Plaintiffs also argue that Act 1110 is preempted by

---

[32] *Id.* at 22.

[33] Pls.' Mot. for Summ. J. (Doc. 330).

[34] *Id.* at 2.  Plaintiffs also seek an award of "costs, attorneys fees, and all other just and proper relief."  *Id.*  The Court will address the propriety of costs and attorneys' fees at a later date upon a proper motion.

[35] Fed. R. Civ. P. 56(a).

[36] Br. in Supp. of Pls.' Mot. for Summ. J. (Doc. 331) at 6–14.

federal law under the Supremacy Clause.[37]  The Court previously addressed these legal questions in its Preliminary Injunction Order.[38]  As explained below, nothing that has occurred since the Preliminary Injunction Order, including Plaintiffs' arguments in their Summary Judgment papers, has altered the Court's prior conclusions.

Plaintiffs raise an additional issue that they did not raise at the preliminary-injunction stage. Specifically, Plaintiffs contend that Defendants are required to pay interest on any unlawfully confiscated stimulus funds.[39]  For the reasons discussed in Section II.E. of this Order, the Court will not require Defendants to pay any interest.

### A.  Takings Clause

In the Preliminary Injunction Order, the Court found that diverting prisoners' stimulus funds to an inmate welfare fund or the Division of Correction Inmate Care and Custody Fund Account was (more likely than not) an unconstitutional taking without just compensation.[40] Plaintiffs agree that such use of prisoners' stimulus funds is an unconstitutional taking because it does not provide just compensation.[41]  Defendants all but concede that point—at the very least they acquiesce to it.[42]  For the reasons discussed in the Preliminary Injunction Order, the Court now concludes that diverting prisoners' stimulus funds to an inmate welfare fund or the Division

---

[37] *Id.* at 14–19.

[38] *See* Prelim. Inj. Order (Doc. 79) at 6–24.

[39] Br. in Supp. of Pls.' Mot. for Summ. J. (Doc. 331) at 19–25.

[40] Prelim. Inj. Order (Doc. 79) at 23–24.  The Fifth Amendment's Takings Clause "is applicable to the States through the Fourteenth Amendment."  *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 122 (1878).

[41] Br. in Supp. of Pls.' Mot. for Summ. J. (Doc. 331) at 8–9.

[42] Defs.' Resp. to Pls.' Mot. for Summ. J. (Doc. 344) at 2 (Defendants renewing their previous request that the Court make its preliminary injunction permanent); *see also* Defs.' Mot. for Permanent Inj. (Doc. 151) ¶¶ 10–13; Br. in Supp. of Defs.' Mot. for Permanent Inj. (Doc. 152) at 1.

of Correction Inmate Care and Custody Fund Account is an unconstitutional taking without just compensation.

The Court also previously ruled that (more likely than not) using prisoners' stimulus funds to pay off court fines, fees, costs, or restitution did not violate the Takings Clause.[43]   That is because the payment of court fines, fees, costs, or restitution constituted just compensation. Plaintiffs now push back on this preliminary conclusion, arguing that paying off prisoners' debts is not just compensation because "'[j]ust compensation' under the Fifth Amendment 'means the full and perfect equivalent *in money* of the property taken.'"[44]   As Plaintiffs see it, the only constitutionally permissible form of just compensation is cash.   But the Supreme Court has acknowledged that "[n]o decision of this Court holds that compensation other than money is an inadequate form of compensation under eminent domain statutes."[45]   More specifically, the Supreme Court has said that "consideration other than cash—for example, any special benefits to a property owner's remaining properties—may be counted in the determination of just compensation."[46]   Indeed, the very next sentence in the case that Plaintiffs cite clarifies the just-compensation rule by stating that "[t]he owner is to be put in as good position pecuniarily as he would have occupied if his property had not been taken."[47]   That is simply another way of saying what this Court said in its Preliminary Injunction Order: The prisoners are provided with a "dollar-

---

[43] Prelim. Inj. Order (Doc. 79) at 22–23.

[44] Br. in Supp. of Pls.' Mot. for Summ. J. (Doc. 331) at 8 (quoting *United States v. Winnebago Tribe of Neb.*, 542 F.2d 1002, 1006 (8th Cir. 1976)).

[45] *Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 150 (1974).

[46] *Id.* at 151.

[47] *Winnebago Tribe of Neb.*, 542 F.2d at 1006 (quoting *United States v. Miller*, 317 U.S. 369, 373 (1943)).

for-dollar benefit" when their stimulus funds are used to pay off their existing court fines, fees, costs, or restitution.[48]

In sum, the Court concludes that enforcement of Act 1110 violates the Takings Clause when prisoners' stimulus funds are diverted to an inmate welfare fund or the Division of Correction Inmate Care and Custody Fund Account.  On the other hand, there is no unconstitutional taking when prisoners' stimulus funds are used to pay off their existing court fines, fees, costs, or restitution.

### B. Procedural Due Process

In the Preliminary Injunction Order, the Court concluded that there was (more likely than not) a procedural due process violation when state prison officials diverted prisoners' stimulus funds to an inmate welfare fund and the Division of Correction Inmate Care and Custody Fund Account.[49]   That conclusion flowed from two related observations: (1) that Act 1110 only authorizes the state prison officials to confiscate stimulus funds when such a confiscation is not "prohibited by federal law"; and (2) therefore, prisoners must be afforded "an ability to contest whether confiscation of the stimulus payments is 'prohibited by federal law.'"[50]  Because neither Act 1110 nor the state prison system's internal grievance procedures currently provide for any opportunity to "challenge a confiscation as violating federal law," there is a violation of procedural due process.[51]   Plaintiffs agree with the Court.[52]   Defendants all but concede the point—or at the

---

[48] Prelim. Inj. Order (Doc. 79) at 22–23.

[49] *Id.* at 19.

[50] *Id.*

[51] *Id.*

[52] Br. in Supp. of Pls.' Mot. for Summ. J. (Doc. 331) at 12.

very least acquiesce to it.[53]   For the reasons discussed in the Preliminary Injunction Order, the Court now concludes that, under present circumstances, diverting prisoners' stimulus funds to an inmate welfare fund or the Division of Correction Inmate Care and Custody Fund Account is a violation of the procedural component of the Due Process Clause of the Fourteenth Amendment.

With respect to the confiscated stimulus funds that are used to pay off existing court fines, fees, costs, or restitution, the Court reaffirms its prior conclusion that procedural due process is satisfied.[54]   This Court concluded in the Preliminary Injunction Order that the Eighth Circuit case *Mahers v. Halford* "is authoritative as to restitution and highly persuasive as to court fines, fees, and costs."[55]   Nothing has changed the Court's view on this point.

### C.  Substantive Due Process

In the Preliminary Injunction Order, the Court construed the (then *pro se*) Plaintiffs' Complaint and Motion for Preliminary Injunction to include an argument that Act 1110 violated the prisoners' substantive due process rights.[56]   The Complaint and Motion were rather vague as to the substantive due process argument that Plaintiffs were trying to make.[57]   Given that the Court was liberally construing vague and ambiguous *pro se* pleadings and motion papers, the Court presumed Plaintiffs were trying to make a traditional tiers-of-scrutiny substantive due process

---

[53] Defs.' Resp. to Pls.' Mot. for Summ. J. (Doc. 344) at 2 (Defendants renewing their previous request that the Court make its preliminary injunction permanent); *see also* Defs.' Mot. for Permanent Inj. (Doc. 151) ¶¶ 10–13; Br. in Supp. of Defs.' Mot. for Permanent Inj. (Doc. 152) at 1.

[54] Prelim. Inj. Order (Doc. 79) at 13–14.

[55] *Id.* at 14 (discussing *Mahers v. Halford*, 76 F.3d 951 (8th Cir. 1996)).

[56] *See id.* at 1, 20–21.

[57] *See* Pl.'s Am. Compl. (Doc. 11) at 4 (Mr. Lamar's *pro se* Amended Complaint stating that "taking the stimulus money of an incarcerated person for *no reason* at all violates Due Process of Law"); Pl.'s Mot. for Prelim. Inj. (Doc. 17) at 9–10 (Mr. Lamar's *pro se* Motion for a Preliminary Injunction arguing that "Act 1110 also violates . . . the Due Process Clause of the 14th amendment").

argument.  Thus, the Court had to identify and define the particular "right" that the *pro se* Plaintiffs were trying to allege was protected by the substantive due process doctrine.[58]

The Court considered the right at issue to be "the right of a prisoner to receive and spend generalized financial aid from the federal government."[59]  The Court concluded that such a right was "not fundamental" and therefore only rational basis review applied.[60]  The Court held that Act 1110 likely survived rational basis review because diversion of "the prisoners' federal relief and stimulus funds is rationally related to the State's legitimate interest in collecting court fines, fees, costs, and restitution, maintaining the statutorily mandated inmate welfare funds, and helping pay for other costs associated with housing inmates."[61]

Plaintiffs (now represented by counsel) do not challenge the Court's legal analysis in the Preliminary Injunction Order.  This time around, they take a completely different analytical approach to the substantive due process issue.  They do not argue that Act 1110 itself violates the substantive due process doctrine.  Instead, they argue that Defendants' conduct in confiscating the prisoners' stimulus funds violates the substantive due process doctrine.[62]  This changed focus of the claim alters the analytic framework that applies.  For claims like the one now being pressed, the Eighth Circuit first asks whether the conduct of an executive officer violates a fundamental right.[63]  If the answer to that question is yes, the Eighth Circuit next asks whether "the behavior of

---

[58] Prelim. Inj. Order (Doc. 79) at 6 n.26 (noting that *pro se* complaints must be liberally construed); *id.* at 20 (stating that Supreme Court precedent requires defining a substantive-due-process right with "the utmost care").

[59] *Id.* at 21.

[60] *Id.* 20–21.

[61] *Id.* at 20.

[62] Br. in Supp. of Pls.' Mot. for Summ. J. (Doc. 331) at 12–13.

[63] *Folkerts v. City of Waverly*, 707 F.3d 975, 980 (8th Cir. 2013).

the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience."[64]

Plaintiffs contend that Defendants' conduct is a substantive due process violation because "a fundamental right was violated and [the state prison officials'] conduct shocks the conscience."[65]  Plaintiffs define the fundamental right as the "right to be free from *unauthorized* government confiscation of money that they received from outside sources."[66]  From this premise, they argue that their fundamental rights were violated and will continue to be violated because Defendants "do not have statutory authority to confiscate" the prisoners' stimulus payments.[67]

According to Plaintiffs, Defendants' conduct is an "unauthorized government confiscation" because (1) Act 1110 only authorizes confiscations that are not "prohibited by federal law"; and (2) confiscating the prisoners' stimulus payments "violate[s] federal law at multiple points."[68]  And, Plaintiffs say, Defendants knew or should have known the confiscation was not authorized by statute.[69]  Thus, Plaintiffs' argue, Defendants were "deliberately indifferent" to their lack of statutory authority, which "shocks the conscience."[70]  Defendants fail to directly address Plaintiffs' new substantive due process argument.  (Instead, Defendants address the tiers-of-scrutiny analysis in the Preliminary Injunction Order.)  However, Defendants' summary

---

[64] *Id.*

[65] *Id.* at 13 (quoting *Mitchell v. Dakota Cnty. Soc. Servs.*, 959 F.3d 887, 898 (8th Cir. 2020)).

[66] Br. in Supp. of Pls.' Mot. for Summ. J. (Doc. 331) at 13 (emphasis added) (citing *Parrish v. Mallinger*, 133 F.3d 612, 614 (8th Cir. 1998)).

[67] *Id.*

[68] *Id.* at 13–14.

[69] Plaintiffs emphasize that state actors are charged with knowledge of the law.  *Id.* at 14 (citing *Georgia v. Public.Resource.Org, Inc.*, 140 S. Ct. 1498 (2020)).

[70] *Id.*

judgment briefing does incorporate their argument that Act 1110 is not in conflict with federal law.[71]

With respect to the confiscations used to pay court fines, fees, costs, or restitution, the Court concluded in its Preliminary Injunction Order that such confiscations are likely not prohibited by federal law.[72]  Nothing has altered the Court's conclusion.  Given this, the Court now concludes that Act 1110 therefore authorizes the state prison officials to make such confiscations.  Accordingly, this portion of Plaintiffs' substantive due process claim doesn't work.

The other portion of Plaintiffs' substantive due process claim—the confiscation of funds for the inmate welfare fund and the Division of Correction Inmate Care and Custody Fund Account—is trickier.  This Court has already concluded (in the instant Order) that such confiscation violates the Taking Clause and procedural due process.  Nonetheless, to the extent Plaintiffs are arguing that Act 1110 does not authorize confiscations that violate the Constitution, such a claim is not actionable.  The Supreme Court has expressly declared such a repackaging to be inappropriate: "Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.'"[73]

But perhaps Plaintiffs are also arguing that Act 1110 does not authorize these confiscations because they are prohibited by federal law due to the obstacle preemption doctrine.  Under this reading of Plaintiffs' argument, they would be claiming that confiscating a prisoner's stimulus funds and diverting those funds to an inmate welfare fund and the Division of Correction Inmate

---

[71] *See* Defs.' Resp. to Pls.' Mot. for Summ. J. (Doc. 344) at 8–16.

[72] Prelim. Inj. Order (Doc. 79) at 14, 21–23.

[73] *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)).

14

Care and Custody Fund Account stands as an obstacle to the accomplishment and execution of the full purposes and objectives of the three federal stimulus acts. There is some force to this argument. After all, in the Preliminary Injunction Order, the Court did note (in *dicta*) the following:

> A state statute [like Act 1110] that renders its provisions inapplicable where they would otherwise be preempted essentially saves itself from formal preemption. It is true that, given this analysis, *ADC officials are acting in excess of their state law authority* when they take any more of a prisoner's stimulus money than necessary to pay off court fines, fees, costs, or restitution.[74]

Plaintiffs' point, then, would be that, (essentially) because of the obstacle preemption doctrine, Act 1110 does not authorize the confiscation of funds for an inmate welfare fund and the Division of Correction Inmate Care and Custody Fund Account.

But it is not clear to this Court that such a claim is actionable. Plaintiffs' claim requires proving a conflict between Act 1110 and the federal stimulus acts. That sure makes it seem like Plaintiffs' claim is really just a repackaged preemption claim. And, as explained in Section II.D. of this Order, these plaintiffs cannot bring a preemption claim based on the federal stimulus acts. In any event, even if this type of claim was possible, and even if Plaintiffs are right that Act 1110's "unless prohibited by federal law" language operates to deprive state officials of statutory authority in these circumstances, Plaintiffs' claim still fails. That is because Plaintiffs cannot establish that Defendants engaged in conduct that "shocks the conscience."

"Conscience shocking conduct only includes 'the most severe violations of individual rights that result from the brutal and inhumane abuse of official power.'"[75] "Only a purpose to cause harm *unrelated to the legitimate object of* the government action in question will satisfy the

---

[74] Prelim. Inj. Order (Doc. 79) at 12 (emphasis added).

[75] *Mitchell*, 959 F.3d at 898 (quoting *White v. Smith*, 696 F.3d 740, 757–58 (8th Cir. 2012)).

element of arbitrary conduct shocking to the conscience, necessary for a due process violation."[76]
There is no record evidence that any state official knew the confiscations fell outside the statutory
authority given to them under Act 1110.  From the face of the Act, there would be no way to know
such a thing.  And, while Plaintiffs are generally correct that everyone is presumed to know the
law, that does not require Defendants to accurately predict a future judicial holding construing
complicated statutory text and how it is impacted by perplexing preemption doctrines.  In short,
Defendants' understanding of Act 1110—that it authorized and required confiscation of stimulus
payments for the inmate welfare fund and the Division of Correction Inmate Care and Custody
Fund Account—was highly reasonable.  The fact that Defendants turned out to be wrong (at least
according to this judge) does not mean Defendants were "deliberately indifferent" or otherwise
did something to "shock the conscience."

### D.  Supremacy Clause

In the Preliminary Injunction Order, the Court addressed the *pro se* Plaintiffs' claims that
Act 1110 was preempted by the federal stimulus statutes.[77]  The Court concluded that a private
plaintiff could not maintain a preemption claim based on the federal stimulus statutes because
those statutes did not provide a private right of action.[78]  Plaintiffs re-assert the same argument
now.[79]  But Plaintiffs do not persuade the Court to alter its prior conclusion that neither the CARES

---

[76] *Id.* (quoting *Folkerts*, 707 F.3d at 981).

[77] Prelim. Inj. Order (Doc. 79) at 6–12.

[78] *Id.* at 6–10.

[79] Br. in Supp. of Pls.' Mot. for Summ. J. (Doc. 331) at 15–19.

Act, nor the CAA, nor the ARPA supports a private right of action under the statutes themselves or in combination with 42 U.S.C. § 1983.[80]

Plaintiffs also have a new preemption argument.  Plaintiffs argue that the Supremacy Clause renders Act 1110 unenforceable because Act 1110 is "preempted by the United States Constitution . . . ."[81]  And Plaintiffs note that § 1983 provides a right of action to enforce the Fifth and Fourteenth Amendments.[82]  Because those Amendments are violated by enforcement of Act 1110, Plaintiffs say, then Act 1110 is necessarily preempted.[83]  Plaintiffs are of course correct that the Supremacy Clause commands this Court to prioritize remedying federal constitutional violations over allowing enforcement of the state law.[84]  That is exactly what the Court does today by permanently enjoining the acts of state prison officials that would violate the Takings Clause and procedural due process.  But, if the Plaintiffs mean to suggest that enforcement of Act 1110 is an independent "violation" of the Supremacy Clause, this argument fails.  There is no such thing as a standalone Supremacy Clause claim.[85]  The Supreme Court has made clear that the Supremacy Clause does not itself create any enforceable rights.[86]  It is simply a "rule of decision."[87]  Its role

---

[80] *See* Prelim. Inj. Order (Doc. 79) at 7–8 (noting that the stimulus statutes "operate[] almost entirely as [directives] to a federal agency" and that "there are already remedial schemes in place to vindicate interests created by" the stimulus statutes).

[81] *Id.*

[82] *See* Br. in Supp. of Pls.' Mot for Summ. J. (Doc. 331) at 15.

[83] *Id.*

[84] *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324 (2015).

[85] Even if this argument is the one that Plaintiffs mean to advance, any victory would be a nominal one because the Plaintiffs would obtain the exact same remedy as they do today for proving violations of the Takings Clause and the procedural component of the Due Process Clause—equitable restitution of improperly confiscated money and the prevention of future improper confiscations.

[86] *Armstrong*, 575 U.S. at 326.

[87] *Id.*

in a case like this is to direct courts to vindicate federal law (including the United States Constitution) to the detriment of state law when the two cannot co-exist.[88]

### E.  Interest

In their Motion for Summary Judgment, Plaintiffs sought "the interest Defendants have earned on the Plaintiffs' money . . . ."[89]  But the only evidence in the record on this point establishes that no interest is earned on the confiscated stimulus funds.[90]  In recognition of this fact, Plaintiffs have now tweaked their position.  They now argue that, even if there is no actual interest to return, they are still entitled to such monies—essentially as pre-judgment interest under this Court's equitable powers.[91]

---

[88] *Kansas v. Garcia*, 140 S. Ct. 791, 801 (2020).

[89] Pls.' Mot. for Summ. J. (Doc. 330) at 2.  In the Summary Judgment briefing, both sides dedicated much of their energy to arguing the broad issue of whether prisoners have a property right to interest earned on money at all.  *See* Br. in Supp. of Pls.' Mot. for Summ. J. (Doc. 331) at 19–25; Defs.' Resp. to Pls.' Mot. for Summ. J. (Doc. 344) at 16–18; Reply in Supp. of Pls.' Mot. for Summ. J. (Doc. 359) at 5–8; Pls.' Mot. to Supplement Mot. for Summ. J. (Doc. 414).  That's not really the right question to ask under these circumstances.  That question could be relevant in a situation where the money was sitting in a prisoner's inmate account and Defendants were refusing to allow the prisoners to earn interest at all, or where the prisoner's account was earning interest, but Defendants were diverting the earned interest elsewhere.  In a case like that, the alleged violation would be the confiscation of the earned interest itself and a court might be required to determine the scope of a prisoner's property right in interest earned on money.

In the case at bar, the state prison officials have wrongfully taken and wrongfully withheld the prisoners' principal.  Any (purely hypothetical, as it turns out) interest earned on the wrongfully confiscated stimulus funds deposited in the sequestered account would therefore be a direct result from the wrongful taking and wrongful withholding of the prisoners' stimulus funds.  So, the real question is whether return of that earned interest (or some other form of interest, such as pre-judgment interest) would be required as part of an equitable remedy.  As explained below, the Court concludes that pre- and post-judgment interest are inappropriate in this case.  *See infra* notes 92–96 and accompanying text.

[90] Ex. 1 (Third Decl. of Jeffrey Jerry) to Defs.' Resp. to Pls.' Mot. for Summ. J. (Doc. 344-1) ¶ 8; *see also* Mar. 4, 2021 Hr'g Tr. at 4–5.

[91] Reply in Supp. of Pls.' Mot. for Summ. J. (Doc. 359) at 5–6; *see also* Mar. 4, 2021 Hr'g Tr. at 6.  Plaintiffs expressly disclaimed that they are entitled to pre-judgment interest as a matter of constitutional or statutory right.  *See* Mar. 4, 2021 Hr'g Tr. at 6 (Plaintiffs' Counsel stating that the request for pre-judgment interest "relates to [the Court's] powers under the equitable restitution").

While "it is never automatic,"[92] "prejudgment interest should ordinarily be granted unless exceptional or unusual circumstances exist making the award of interest inequitable."[93]   Thus, Plaintiffs are correct that pre-judgment interest would normally be appropriate.  The problem for Plaintiffs is that this is not a normal case.  Awarding pre-judgment interest here means that either the state prison officials themselves or the State of Arkansas would have to give the prisoners money that was never actually taken from the prisoners or obtained by the State or by state actors as a result of that wrongful confiscation.  Put another way, this portion of the money would have to come from either the pockets of the state prison officials or the treasury of the State of Arkansas.

As the Court noted in the Preliminary Injunction Order, "[a] suit against a state official for money in federal court raises the specters of Eleventh Amendment immunity, state sovereign immunity, and qualified immunity . . . ."[94]  It is one thing for the Court to order the return of wrongfully taken money and any profits that flow directly from that wrongful confiscation.  But it is quite another thing for the Court to order state officials or the State itself to pay additional money.  That seems to strike at the heart of the immunity doctrines.  Even if such an order would technically not be barred by immunity, the same considerations create "exceptional or unusual

---

[92] *Thomas v. Bakery, Confectionary and Tobacco Workers Int'l Union, Local No. 433*, 982 F.2d 1215, 1220 (8th Cir. 1992).

[93] *Stroh Container Co. v. Delphi Indus., Inc.*, 783 F.2d 743, 752 (8th Cir. 1986).

[94] Prelim. Inj. Order (Doc. 79) at 24–25.

circumstances," and thus make such an order inequitable here.[95]   Accordingly, the Court will not impose any form of interest.[96]

## CONCLUSION

The Court GRANTS in part Plaintiffs' Motion for Summary Judgment.  Specifically, the Court grants summary judgment to the Plaintiffs on the following portions of its claims:

- The Takings Clause of the Fifth Amendment is violated when Defendants divert a prisoner's confiscated stimulus funds to an inmate welfare fund or the Division of Correction Inmate Care and Custody Fund Account.

- Under the circumstances now present, the procedural component of the Due Process Clause of the Fourteenth Amendment is violated when Defendants divert a prisoner's confiscated stimulus funds to an inmate welfare fund or the Division of Correction Inmate Care and Custody Fund Account.[97]

---

[95] *Stroh Container Co.*, 783 F.2d at 752.  Plaintiffs note that, under an Arkansas Department of Correction Ouachita River Correctional Unit Policy ("the Ouachita Policy"), prisoners may "deposit funds in interest-bearing accounts and accrue the interest earned on those accounts" upon "written approval of the Warden."  Ex. 1 (the Ouachita Policy) to Pls.' Mot. to Supplement Mot. for Summ. J. (Doc. 414-1) ¶¶ V, VI.A.  Plaintiffs argue that the Ouachita Policy shows that the prisoners "could have" placed their stimulus funds in interest bearing accounts and therefore the Court should award interest as part of the equitable remedy.  *See* Pls.' Mot. to Supplement Mot. for Summ. J. (Doc. 414) ¶¶ 3–4.  But there is no allegation—let alone any evidence to support an allegation—that any of the plaintiffs have opened (or tried to open) an interest-bearing account pursuant to the Ouachita Policy.  The mere possibility that the prisoners could have earned interest by placing their wrongfully confiscated funds in an interest-bearing account is not enough to overcome the Court's concerns with the immunity doctrines or the "exceptional or unusual circumstances" of ordering the state prison officials or the State of Arkansas to pay the prisoners additional money.

[96] 28 U.S.C. § 1961(a) provides that post-judgment interest "shall be allowed on any money judgment in a civil case recovered in district court."  This requirement does not govern cases in equity.  *See Clarke v. Hot Springs Elec. Light & Power Co.*, 76 F.2d 918, 922 n.1 (10th Cir. 1935) (citing *Perkins v. Fourniquet*, 55 U.S. 328, 14 How. 328, 331 (1852)).  Both *Clarke* and *Perkins* dealt with former iterations of § 1961.  *See Clarke*, 76 F.2d at 922 (discussing former 28 U.S.C. § 811 which "was originally enacted in 1842"); *Perkins*, 55 U.S. at 331 (discussing "[t]he act of 1842").  It may well be true that "an equity court has power to grant interest by analogy to § 1961," *Donovan v. Sovereign Security, Ltd.*, 726 F.2d 55, 58 (2d Cir. 1984), but this Court finds that such analogizing is inappropriate in this case for the same reasons that awarding pre-judgment interest would be inequitable.

[97] To the extent Plaintiffs requested declaratory relief and to the extent it is appropriate, the Court declares that, under present circumstances, confiscating the federal stimulus payments sent to prisoners and then diverting those funds to an inmate welfare fund or the Division of Correction Inmate Care and Custody Fund Account violates the Takings Clause of the Fifth Amendment and the procedural component of the Due Process Clause of the Fourteenth Amendment.

As to all other aspects of each claim in Plaintiffs' Motion for Summary Judgment, the Court DENIES the Motion[98] and GRANTS summary judgment to Defendants.[99]   The Court will now proceed to determine the scope and terms of the permanent injunction.

## SCOPE OF INJUNCTION

This Motion for Summary Judgment was only brought by three individual plaintiffs.  There has been no class certification, so these plaintiffs are only litigating their own interests.  But Act 1110 tells Defendants to take the stimulus funds of any "person who is in the custody of the Department of Corrections" and place those funds in an inmate welfare fund or the Division of Correction Inmate Care and Custody Fund Account if the prisoner does not have existing court fines, fees, costs, or restitution.[100]   And dozens of prisoners have brought claims identical to those resolved by the Court today.  Accordingly, both sides have asked the Court to enter an injunction that covers all prisoners to whom Act 1110 applies.[101]

In the Court's view, injunctive relief generally should not extend beyond the specific plaintiffs before the Court.  That is because an overly broad injunction: (1) risks exceeding the bounds of the judicial power,[102] (2) may be unnecessarily burdensome on the enjoined

---

[98] Pls.' Mot. for Summ. J. (Doc. 330).

[99] The Court treats Defendants' Motion for a Permanent Injunction (Doc. 151) as a Cross-Motion for Summary Judgment. Doing so makes enormous practical sense. Defendants' Motion in essence asked the Court to finalize its preliminary rulings—both those in favor of Plaintiffs and those in favor of Defendants.  Furthermore, all disputes in this case are legal.  That is, there are no factual disputes and thus nothing would change between now and a trial on the merits.  Without considering Defendants' motion to be a cross-request for summary judgment, the Court would be unable to grant final relief at this time.  That is because Plaintiffs would still have active claims remaining in the litigation (*i.e.*, all of their claims for which the Court did not grant summary judgment in their favor).  Neither party wants this outcome, and it is not necessary in the context of this case.

[100] Ark. Code Ann. § 12-29-120(a), (d).

[101] Dec. 1, 2021 Hr'g Tr. at 10–14, 17–23.

[102] *See Rodgers v. Bryant*, 942 F.3d 451, 460–65 (8th Cir. 2019) (Stras, J., concurring in part and dissenting in part) (detailing the impropriety of "universal injunction[s]").

defendant,[103] and (3) may hinder the procedural rights of nonparties covered by the injunction.[104] Nevertheless, the Eighth Circuit has approved statewide injunctions when "the violation established . . . impacts the entire state," and the lack of statewide relief would "require every plaintiff seeking statewide relief from legislative overreach to file for class certification."[105] Moreover, in this case, Defendants are expressly asking for the injunction against them to extend statewide and to cover all state prisoners.[106]  In light of the binding precedent, and the agreement of the parties as to the scope of the injunction, today's injunction will cover all prisoners to whom Act 1110 applied, applies, or could apply.[107]

---

[103] *See, e.g.*, *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (noting "the rule that injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs").

[104] Michael T. Morley, *De Facto Class Actions? Plaintiff- and Defendant-Oriented Injunctions in Voting Rights, Election Law, and Other Constitutional Cases*, 39 Harv. J. L. & Pub. Pol'y 487, 527–28 (2016) ("All alleged rightsholders across the state or nation become, in effect, members of an implied class, despite the fact that they have not been brought before the court, been notified about the case, or consented to such representation.").

[105] *Rodgers*, 942 F.3d at 458.

[106] Dec. 1, 2021 Hr'g Tr. at 10–13.

[107] It is worth noting that there is another section of Act 1110 that applies to any "person who is in the custody of a local or regional correctional facility . . . ."  Ark. Code Ann. § 12-41-109.  Under this provision, any such person is "required to first use the federal relief or stimulus funds to pay off existing court fines, fees, costs, or restitution before he or she may use the federal relief or stimulus funds for any other purpose."  *Id.*  This provision does not say anything about diverting funds to an inmate welfare fund, the Division of Correction Inmate Care and Custody Fund Account, or any other similar account.  Because § 12-41-109 only relates to court fines, fees, costs, or restitution, today's Order and the accompanying permanent injunction do not prevent enforcement of this specific section of Act 1110.

## PERMANENT INJUNCTION[108]

For the reasons stated above, the Court enters the following permanent injunction:

1. The Court orders Defendants to return any confiscated federal relief or stimulus funds currently held in the sequestered account that are not being used to pay off a prisoner's court fines, fees, costs, or restitution.  Defendants have 90 days from the date of this Order to return such funds to the prisoner or former prisoner from whom those funds were confiscated.

2. Defendants may continue to collect prisoners' federal relief or stimulus funds pursuant to Act 1110 so long as the confiscated funds are deposited into the sequestered account. Otherwise, the confiscation may not occur.  For any future confiscations of federal relief or stimulus funds, Defendants will have 90 days from the date of confiscation to determine whether a prisoner has existing court fines, fees, costs, or restitution.  Defendants may use the confiscated funds to pay off existing court fines, fees, costs, or restitution.  However, on or before the 90th day, Defendants must return to the prisoner or former prisoner any confiscated funds that are in excess of the identified court fines, fees, costs, or restitution.

3. Defendants shall continue to maintain specific and detailed records of: (a) which prisoner's federal relief or stimulus funds have been deposited into the sequestered account; (b) how much of each prisoner's federal relief or stimulus funds have been deposited into the sequestered account; and (c) how much of each prisoner's federal relief or stimulus funds in the sequestered account have been used to pay court fines, fees, costs, or restitution.

4. When a prisoner or former prisoner has federal stimulus or relief funds in excess of his or her identified court fines, fees, costs, or restitution, and Defendants return the excess funds to the prisoner or former prisoner, Defendants must provide that prisoner or former prisoner with documentation detailing: (a) the date or dates the federal relief or stimulus funds were confiscated; (b) the amount of confiscated funds used to pay court fines, fees, costs, or restitution; (c) the amount of confiscated funds that have been returned; and (d) the date the confiscated funds were returned.

---

[108] The standard for issuing a permanent injunction is "essentially the same" as the standard for a preliminary injunction.  *Oglala Sioux Tribe v. C & W Enterprises, Inc.*, 542 F.3d 224, 229 (8th Cir. 2008).  The "one key difference" is that, for a permanent injunction, the moving party must "show actual success on the merits, rather than" merely meet the likelihood-of-success standard applicable at the preliminary-injunction stage.  *Id.*; *see also* Prelim. Inj. Order (Doc. 79) at 5.  As this Order explains, Plaintiffs have shown actual success on portions of their Takings Clause and procedural due process claims.  The remaining factors of the permanent injunction test (threat of irreparable harm absent the injunction, potential injury to the enjoined party, and the public interest) support a permanent injunction here.  *Oglala Sioux Tribe*, 542 F.3d at 229.  The Court thoroughly discussed these factors in the Preliminary Injunction Order.  (Doc. 79) at 24–28.  Neither side contests the Court's conclusions as to those factors nor argues that a permanent injunction is inappropriate for any other reason.  Indeed, the Defendants themselves have asked that a permanent injunction be entered.  Defs.' Resp. to Pls.' Mot. for Summ. J. (Doc. 344) at 2 (Defendants renewing their previous request that the Court make its preliminary injunction permanent); *see also* Defs.' Mot. for Permanent Inj. (Doc. 151) ¶¶ 10–13; Br. in Supp. of Defs.' Mot. for Permanent Inj. (Doc. 152) at 1.

5.  Defendants may not otherwise use in any manner or disburse the federal relief or stimulus funds in the sequestered account.  This includes, but is in no way limited to, placing any confiscated federal relief or stimulus funds into an inmate welfare fund or the Division of Correction Inmate Care and Custody Fund Account.[109]

IT IS SO ORDERED this 16th day of March 2022.

_____
LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE

---

[109] The Court retains jurisdiction to enforce this injunction.  *Picon v. Morris*, 933 F.2d 660, 662 (8th Cir. 1991) ("[W]hen a court issues an injunction, it automatically retains jurisdiction to enforce it.") (quoting *United States v. Fisher*, 864 F.2d 434, 436 (7th Cir. 1988)).